# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

American Hypnotherapy Society, LLC et al,    )
)
              Plaintiffs,    )
)
          V.    )    Case No.: 2:19-cv-06116-RBS
)
ABC Capital Investments, LLC, et al.    )
)
           Defendants.    )

**BRIEF OF DEFENDANTS IN OPPOSITION TO
PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF**

## I.     <u>Introduction</u>

Defendants, ABC Capital Investments, LLC, ABC Capital Realty, LLC, Philly Acquisitions, LLC, Giovanni Real Estate, LLC, New Philly Construction, LLC, Stateside-Philly, LLC, Jason "Jay" Walsh, and Karen Lee-Walker, oppose Plaintiffs' Motion for Injunctive Relief:

This Court should <u>not</u> grant Injunctive Relief. First, there is <u>no pending, ongoing or future emergency</u> warranting injunctive relief. All damages, as alleged, are economic damages capable of being calculated by the parties. There is no immediate emergency that suddenly emerged in June 2020 that warrants such drastic relief.

Injunctive relief is not required to compel the production of documents. Plaintiffs will receive all documents and information consistent with routine discovery requests.

And finally, freezing corporate bank accounts is unjustified without a final judgment, and will interfere in general business operations having nothing to do with the plaintiffs.  Moreover,

1

as set forth in the filed Answer, there are defenses to these claims as alleged, and not all parties have been joined properly here.

## II.     Factual Background

The following facts have been verified by the Plaintiffs' representative, Jason Walsh, who has attached a declaration to verify the following facts set forth below.  See Ex. "A", declaration of Mr. Walsh.

1.     Jason Walsh is co-owner of the business entities named in this lawsuit.  He has over twenty-three years of experience in the real estate business, over nine years as a founding member of ABC Capital, and has first-hand information regarding the following facts, and the facts are based upon sales records and public records setting forth the property sales data listed below.

2.     Contrary to the assertions set forth in the Complaint and this Injunction Motion, the ABC companies did not plan to defraud its investors, did not orchestrate a scheme, or form an enterprise to defraud its investors.

3.     Mr. Walsh has reviewed the books and records regarding each property, and has set forth below any amounts which remain due to the investor. At best this is a breach of contract claim only, and other causes of action for RICO or violations of the Securities Act is misplaced and without factual support.

4.     Each and every investor purchased a property and continues to own the property, unless the property was sold.

5.     Each investor received rent payments for properties which were occupied where rent was received.  For unoccupied properties, or when rent was not received, ABC paid rent to the

investors pursuant to ABC's contractual obligations through December 2017, or in other cases, 2018.

6.      ABC had guaranteed rent payment to these investors for three years, initially, unless renewed.

7.      By January 2017, ABC had also relied upon a third party rent insurance company to insure these payments in the event of tenant non-payment. ABC, in good faith, planned to insure all of these properties with rent insurance so that another company could insure against the risk of tenant non-payment. That rent insurance company breached their agreement with ABC by failing to issue policies and pay rent claims.  ABC Capital filed a lawsuit which remains pending against the rent insurance company since ABC and its investors have been harmed financially. See Ex. "B", Complaint filed in ABC Capital Investments vs Nationwide Rentsure, et al, No. 17-4980 (E.D. PA). This is the primary reason ABC was not able to issue rent guarantee payments because ABC's insurer did not keep their promises that they would insure our Philadelphia rental properties. See ABC Capital Investments vs Nationwide Rentsure, et al, No. 17-4980 (E.D. PA) (12/16/2019 Memorandum Opinion partially denying defendant's motion to dismiss, thereby allowing ABC Capital to pursue breach of contract claims, insurance bad faith claims and fraud claims against defendants for failing to pay rent insurance claims).

http://www.paed.uscourts.gov/documents/opinions/19D0818P.pdf

8.      ABC offered these Hong Kong investors and assignment of proceeds from the rent insurance company since ABC was not able to continue paying rent guarantees on its own.

9.      There was no plan in advance not to pay rents owed to our investors, and in good faith, ABC Capital Realty had attempted to issue all payments due. ABC continued to honor the rent

guarantees for months after the rent insurance company breached their agreement with ABC to insure our Philadelphia properties.

10.     It is recognized that not all financial obligations were paid as a result of unexpected costs and real estate market forces that occurred after the original contracts were entered into with these investors. This was in part due to the inability of ABC to insure against the non-payment of rent, unexpected renovation costs and delays, and the non-payment of rent by tenants resulting in evictions and further delays in collecting rent.  This had the domino effect of causing ABC not to pay rent guarantees to some of our investors, or complete renovation projects.

11.     There was no scheme or plan as alleged by Plaintiffs to create a fraudulent business enterprise.

12.     ABC, in good faith, has offered to buy back the houses from investors, and ABC will also complete the renovations that are past due.

13.     There is also no ongoing threat of harm by illegally retaining rental income.

14.     On February 13, 2018, Anchor Realty acquired the property management contracts from ABC Capital Realty, LLC, to manage ABC's properties in Philadelphia when ABC Capital irrevocably assigned all rights, title and interest to assignable property management contracts ABC had with owners of real estate in Philadelphia.  Ex. "C", Agreement.

15.     The transfer of contracts to Anchor Realty was scheduled to occur 100 at a time, with it being anticipated that 1200 contracts would be assigned.

16.     As specified below, the renovated properties below were transferred to Anchor for rent collection and payment, and ABC did not continue to manage these properties.

17.     The exception to this would be if the property was sold at the request of the investor, or if the renovation project remains incomplete.

18.     Originally, in connection with the investors in this lawsuit, the ABC companies entered into deals with a Hong Kong broker, Jubilee, and this company coordinated the Hong Kong deals for the ABC companies.  This involved 110 properties in the Philadelphia market.

19.     Approximately 29 of these properties owned by the Hong Kong investors are in dispute in this case.

20.     There are four investors who have been joined in this lawsuit who were never part of the Hong Kong deals, and they had different deals:  InvestRealty II and InvestRealty III, Sidney Shuay, Tout USA and JD CPW 2013. Together, they owned five properties.

21.     Plaintiff, Sidney Shuay, sold his property on his own on 08/04/2019 to Sarah Robinson as confirmed by public records. Mr. Shauy is a US citizen, who visited and inspected his own properties, and he resides in New Jersey.  Mr. Shauy is the controlling member of InvestRealty II and II, and is the agent for Tout USA and JD CPW 2013.  These entities and people should not be part of this lawsuit as they had separate property management agreement than the Hong Kong investors.

22.     To date, the following properties have already been purchased back from the following ten Plaintiffs:

| Owner | Address | sale date |
|-------|---------|-----------|
| Can Solutions | 2030 Plums St | 7/26/2019 |
| InvestRealty III, LLC | 5716 Commerce St | 4/25/2018 |
| IP Global Investment | 1830 E Airdrie St | 9/11/2018 |
| Lawrence Simple | 5715 Malcolm St. | 9/16/2019 |
| PR Forever Win | 553 S Salford St | 3/29/2019 |
| PR Forever Win | 6345 Wheeler St | 5/1/2019 |
| SELP Investments | 5624 N 10th St | 5/2/2019 |
| Touch Blessing | 2612 S Bonaffon St | 11/2/2018 |
| Whole Win Capital | 3629 N Bouvier St | 7/20/2018 |
| Wind See | 4931 Hoopes St | 10/18/2018 |

23.     ABC's business records also confirmed with Walter Lapidus, the co-owner of Anchor

Realty, that the following properties were assigned to Anchor and have been managed by Anchor

or, as listed below, already sold by the investor. Some of the properties were unfinished with

renovations needing to be completed, and this is listed below.  ABC, in the past two weeks since

the filing of this Motion, has reviewed its business records to confirm any amounts due to each

investor, and to identify any renovation projects which were not completed.  Based on ABC's

review of records, approximately $312,000 is owed collectively, with the greater majority owed

for incomplete renovation work which had been paid in advance by the investor. As rehab work

is completed by ABC, the amount which is owed will be reduced accordingly to zero. Set forth

below is ABC's summary, which may be amended during discovery as we obtain additional

record to finalize all figures.

| Owner | Address | Assignment/Sold/Renovations |
|---|---|---|
| 1509 Blavis Street Co. | 447 N 51 St. | Property not renovated with $40,000 owed to investor until renovation is completed |
| 3824 N Delhi Street Co. | 3824 N Delhi St. | Anchor manages, now vacant, Anchor needs  turnover fees paid by owner to anchor, renovations performed |
| Alphabet Philly | 4850 Brown St. | Renovations completed, for the broker, Jubilee, which owns Alphabet Philly. This investor used his own property management to collect rent |
| American Hypnotherapy Society | 1536 S Marston St. | Plaintiff sold the property for profit on its own. Property taxes owed for $2,102.92. |
| Bestview | 6111 Wheeler St. | Anchor manages this property which is now vacant. Anchor requires the owner to pay a turnover fee to Anchor to prepare the property for a new tenant.  ABC completed all renovations. Bestview declined ABC's buy back offer. |

| Owner | Address | Assignment/Sold/Renovations |
|---|---|---|
| Bestview | 502 E Courtland St. | Bestview declined ABC's buy back, and they sold the property directly for $85,000, and it had been purchased from ABC for $79,125.  $4,468.29 owed for property taxes. |
| Burwood International Investment | 2934 N Ringgold St. | Property not fully renovated or occupied. Property not fully renovated with $15,000 owed to investor until renovation is completed which will take one month of work. $740.68 owed for property taxes. |
| CAN Solution | 2030 Plum St. | ABC purchased the property on 7/26/2019 |
| D&E HK Company | 38 N Frazier St. | Property not fully renovated with $20,000 owed for renovation until completed, and $2,906.64 owed for property taxes |
| Eddie Luk Investments LLC | 116 N 53rd St. | Investor canceled buy back after ABC offered, property was rented, and later managed by Anchor, but not presently |
| Eddie Luk Investments LLC | 2955 N Bambrey St. | Investor canceled buy back after ABC offered, Anchor Manages the property, and the property was renovated |
| Fortune Well | 5561 Chancellor St. | Anchor Manages the property, and the property was renovated |
| InvestRealty II | 1428 W York St. | Not a Hong Kong investor, and owner manages property himself |
| InvestRealty III | 5716 Commerce St. | ABC purchased the property back |
| IP Global Investment | 1830 E Airdrie St. | ABC purchased the property back |
| JD CPW 2013 | 1955 73rd Ave. | Property not fully renovated with $20,000 owed for renovation until completed. ABC entered into a settlement with this investor to buy back the property, and he is not a Hong Kong investor |
| Jessie Investments LLC | 5930 Belmar St. | Property not fully renovated with $30,000 owed for |

| Owner | Address | Assignment/Sold/Renovations |
|---|---|---|
| | | renovation until completed. $2,613.70 owed for property taxes. |
| Land Winner, LLC | 521 N 58th St. | Property not fully renovated with $28,000 owed for renovation until completed. |
| Lawrence Simple Homes | 5715 Malcolm St. | ABC purchased the property back |
| LoveG LLC | 1332 N. 59th St. | Anchor Manages property, and property was renovated |
| LPES Investments | 1153 S 54th St. | Property not renovated with $45,000 owed for renovation until completed. |
| Mana International, LLC | 1438 S 27th St. | Anchor Managed property, and property was renovated; Philadelphia property taxes were not paid, and the property was sold at a tax sale to GB Homes.  The proceeds from the sale should be claimed by owner. The sale was 07/10/2019. The client paid $69,100 originally, and the Sheriff was paid $89,000. |
| Nadiahon, LLC | 4357 N 7th St. | Anchor manages this property which is now vacant. Anchor requires the owner to pay a turnover fee to Anchor to prepare the property for a new tenant. |
| PLES Investments | 5213 Westminster Ave. | Property renovation work incomplete |
| PR Forever Win | 553 S Salford | ABC purchased property back and owner and ABC agreed $18,981.23 owed |
| PR Forever Win | 5856 Angora Terrace | ABC purchased property back |
| PR Forever Win | 6345 Wheeler St. | ABC purchased property back |
| Samfield | 311 E Albanus St. | $3,299.00 owed for back taxes. |
| SELP Investments | 5624 N 10th St. | ABC purchased property back. |
| Sidney Shuay | 1607 Harrison St | American investor who collects rent himself |
| Standing Moai Investment | 853 N 47th St | Property not fully renovated with $23,000 owed for renovation until completed, which can be finished in one |

| Owner | Address | Assignment/Sold/Renovations |
|---|---|---|
| | | month.  $2,045.50 owed for property taxes. |
| Tinwan Company | 1944 E Birch St. | Anchor manages the property; the tenant moved out, and owner not responsive |
| Tinwan Company | 2520 S Felton St | Anchor manages the property; the tenant moved out, and owner not responsive |
| Touch Blessing | 2612 S Bonaffon St. | ABC purchased property back. $2,369.31 owed for property taxes. |
| Vania Bright | 5441 Spruce St. | Investor sold property on their own 11/2019. $4,000 owed for property taxes. |
| Vania Bright | 1363 Unity St | Owner declined ABC's offer to buy, and owner sold to another buyer |
| Whole Win Assets | 121 N Vogdes St. | $2,944.47 owed for unpaid property taxes |
| Whole Win Capital | 3629 N Bouvier St. | ABC purchased property back |
| Wind See | 4931 Hoopes St | ABC purchased property back |
| YL Tang Co | 4851 N Hutchinson St. | Property not fully renovated with $38,000 owed for renovation until completed. |
| Tout USA | 1617 Wakeling St. | Owner collects all rent |

24.     Unless noted by the chart above, all other properties were fully renovated and rented, with all taxes paid, unless otherwise stated in the third column.

25.     In these Hong Kong transactions, ABC sold 110 properties.  He sold more than 10 properties to the entities controlled by Mr. Shauy.  Mr. Walsh reviewed the entire portfolio of Plaintiff's properties, and identified the above 8 properties where the renovations were not completed, which is well less than 10 percent of the properties claimed to be in dispute.

26.     Mr. Walsh reviewed the financial records and have preliminarily estimated that ABC Capital owes approximately $312,000, with the majority of this money owed for unfinished property renovations costs which were pre-paid by the investor.  ABC can continue to perform

9

the renovation work for these projects, which will substantially decrease the amount owed to the investors.

27.     Of the Plaintiffs who are in this lawsuit from Hong Kong, they jointly invested approximately $3.0 million.

28.     All clients became bona fine owners of property in Philadelphia.

29.     As further evidence that this was not a scheme to defraud or take money from ABC's investors, ABC exercised buy backs with the consent of the Plaintiffs and paid collectively approximately $750,000 to buy back properties that had been held by Plaintiffs.

30.     ABC had also offered to buy back $970,000 worth of properties from other Plaintiffs, and they elected not to exercise the buy back options.

31.     Plaintiffs allege in their Complaint that less than "$200,000 was distributed" by ABC for rent. This is completely inaccurate, and suggests that the person who verified Plaintiff's complaint, Alexander Cheung, did not exercise due diligence.

32.     ABC's review of records show that over $450,000 has been paid to the investors alone for rent for these plaintiffs only (this excludes all of the other rent payments issued to all other investors from Hong Kong who are not plaintiffs who owned the majority of properties). See Ex. "D", rent payment records.

33.     This $450,000 figure will increase as ABC reviews additional payment records since in the two weeks we have to reply to this Motion ABC has not been able to compile all bank transaction records. At one point, ABC's payments to Hong Kong required ABC to use bulk payments using Western Union or the client was wired directly. The specific client breakdowns were not listed on the outgoing payment logs ABC retained and they need to obtain the breakdown from Western Union, or from the Plaintiffs who received the money.

34.     In terms of the investors in this lawsuit from Hong Kong, ABC paid rent when it was

collected.  When it was not collected, ABC paid under the guarantee, until the company was not

able to pay and we were compelled to file a lawsuit against our rent insurance company.  Again,

this is not evidence of a scheme or enterprise when ABC's expected insurer does not pay or

process ABC's rent insurance policies or claims.

35.     The fact that tenant occupancy or tenant payment was less than expected is not evidence

of a conspiracy to defraud. Likewise, costs overruns or delays in construction can occur in the

real estate business, and is not evidence of a scheme to defraud our investors.

36.     The ABC parties deny strenuously all claims by Plaintiff's counsel that ABC engaged in

racketeering activities.

37.     Mr. Walsh has reviewed Plaintiffs "Statement of Relevant Facts", and states the

following in response because the "Facts" are disputed.

38.     Plaintiffs stated: "Defendants collectively own, operate, or managed properties through

various related entities with the purpose of selling them to individuals in exchange for a

guaranteed return of their investment."   It is admitted that Defendants, ABC Capital

Investments, LLC, markets and sells properties to individuals and businesses. ABC Capital

Realty, LLC manages properties.  Philly Acquisitions, LLC buys and holds properties for sale.

Giovanni Real Estate, LLC, buys and hold properties for sale. New Philly Construction, LLC,

renovates properties.  Stateside-Philly, LLC buys and holds properties for sale. Jason "Jay"

Walsh is a founding member of ABC Capital Investments, LLC, and the other named entities.

As a member of these companies, I do not enter into contracts as an individual, and my

involvement is on behalf of the legal entities only.  Karen Lee-Walker, is an agent of the named

Defendants. Ms. Walker is an employee of ABC Capital Investments, LLC, and/or Stateside, and

performs work for the defendant business entities, and primarily focuses on title work for property closings.  She is not an owner or member of any of Defendant's business entities. Finally, Defendants do not jointly guarantee a "return of their investment". As set forth in each specific contract, an ABC entity may for a period of time guarantee rent payments, such as for one year, even if the property is not occupied, or if the tenant is not paying.  In this lawsuit we have separate contracts with each party.  With respect to the Hong Kong investors who are joined as Plaintiffs, as set forth in their contracts, ABC Capital Realty, LLC, as the property manager, offered a three year net annual return of at least 8% per annum, as set forth in each contract, subject to cancelation or termination. See Ex. "E", sample contract of 8/20/2015 between ABC Capital Realty and Alphabet Philly.

39.    Plaintiff states: "Each purchaser ("Investor") enters into an Agreement of Sale and Property Management Agreement with Defendants for the renovation, management and/or collection of rent based upon the property and amount invested."  These statements are improper as each investor enters into an agreement of sale with a specific entity and not all named Defendants. Likewise, the Property Management was performed with ABC Capital Realty.  For those properties that needed renovation, that work was performed by New Philly Construction. The rent figures were based on market rates and our expectation of what a tenant paid or will pay to reside in the property.

40.    Plaintiffs state: "Defendants utilize its website[1] as well as other digital marketing mechanisms such as *YouTube* to advertise its business practices.  This is true for the ABC business entities which buy, sell, renovate or manage properties. The collective of Plaintiffs in

---

[1]*See* http://www.abccapitalinvestments.com last visited June 14, 2020.

this lawsuit have not alleged that they reviewed or relied upon any Youtube or online website statement, nor have they recognized in their Statement of Facts that they read the Disclaimers.

41.     Plaintiffs state: "The website explicitly guarantees fixed returns through guaranteed rental income on all acquisitions with a "Passive Income with Turn-Key Rental." [2]  This is a mischaracterization. The website does not expressly guarantee fixed returns.  The site states that [f]irst year rent income is guaranteed is guaranteed and starting the second year you may be able to get rent insurance if you so choose. Return on Investments are 14%+ yearly, in addition to property appreciation." On the same page is ABC's **Disclaimer**, stating that this "information is accurate to the best of ABC Capital's knowledge, information and belief. Nothing herein shall be deemed to be a solicitation for the sale of securities under PA law or otherwise. Nothing herein shall be deemed to be any advice given by anyone other than ABC Capital LLC.  Nothing herein shall be deemed to be containing legal advice, Nothing herein shall be deemed to contain investing advice or anything related to any securities that would be deemed within the scope of the Pennsylvania Securities Commission or United States Securities Commission. All warranties are in writing and all terms and conditions are contained therein.  See

http://www.abccapitalinvestments.com/investing-with-us/

42.     Plaintiff states: "Defendants investments are "hands off real estate" catering to clients outside of Pennsylvania with high returns of "10% - 40%." [3]  These statements from our current, 2020, company website today are partial quotes from the site.  As explained above, this marketing approach includes written disclaimers.  ABC Capital offers passive income from real

---

[2]*Hands off Rental Property*, Homepage, https://www.abccapitalinvestments.com, (last visited June 15, 2020).

[3]*Hands off Rental Property*, Homepage, https://www.abccapitalinvestments.com, (last visited June 15, 2020).

estate; however, at all times, the investors own the property, and they can manage the property, collect rent, and sell the property.  The hands off approach is often chosen by the investor.

43.     Plaintiffs state: "Upon agreeing to terms on a property, Defendants entered into an Agreement of Sale utilizing the Pennsylvania Association of Realtors' Standard Agreement for the Sale of Restate ("Agreement of Sale or AOS") with the Investor. The Agreements were standard forms, but each Agreement was with a specific Defendant selling the property.

44.     Plaintiffs state: "An Addendum to the AOS includes a warranty by Defendants for the following: (1) 3-year warranty for all maintenance costs; (2) roof warranty for 15 years; (3) guaranteed rent for 3 years (the amounts vary per transaction); (4) statement regarding new tenant will be secured at no costs to the client for the first 3 years, if current tenant relocates; (5) investor has no obligation for payment to secure tenants for first 3 years; and (6) inspection rights for the investor after the completion of any renovations." This statement is true only for the Hong Kong investors who are Defendants. This does not apply to all Defendants since the Hong Kong investors received a similar management agreement.

45.     Plaintiffs state: "To complete the transaction, Defendants create Limited Liability Companies ("LLC") for an Investor, used as a conduit to purchase the property."  This is partially true. The Hong Kong investors were foreigners, and ABC assisted these investors by forming legal entities in Pennsylvania.

46.     Plaintiffs state:  " The LLC's principal place of business and registered addresses are under Defendant's exclusive control."  This is misleading. While the original registered business address was ABC's business offices, the entities are owned and controlled by each individual investor, and at any time, these investors can change the agent, the agent's address, or any other corporate information with the Secretary of State.

47.     Plaintiffs state: "At closing, the Investor enters into a Property Management Agreement ("PMA") with Defendants, setting forth the fixed return amount the Investor is to receive per year based upon rents collected solely upon the efforts of Defendants."  Each contract for Property Management was with ABC Capital Realty, LLC, and was not with all Defendants as alleged. ABC Capital Realty agreed to a minimum net annual 8% return on investment with the Hong Kong investors for a period of three years. This three year period "may be extended with current market conditions and by agreement of both the Owner and the Manager". See Ex. "E", Agreement with Alphabet, used as an exemplar of other Hong Kong investor contracts. Moreover, certain Plaintiffs over time collected their own rent and managed their own properties. ABC Capital Realty in 2018 sold its property management contracts to an unaffiliated company, Anchor Realty. For those properties which were completed and occupied, Anchor should have collected rent and paid the Plaintiffs.

48.     Plaintiffs state: "At closing, the Investor pays the agreed upon fixed acquisition cost along with necessary closing costs to transfer the property to the newly formed entity."  Each investor paid the purchase price for the home that had been disclosed in advance, and related costs associated with real estate closings.

49.     Plaintiffs state: "In certain transactions, Defendants provide renovation services for the property necessary to receive expected returns of rental income."  Certain properties were not tenant ready and needed renovation.  As specified above, the renovation work was performed or was to be performed by New Philly Construction, LLC, and not by all Defendants as alleged. Renovation work was necessary to allow tenants to move in and start paying rent.

50.     Plaintiffs state: "At closing, the Investor does not take control of the property, but instead the property is controlled by Defendants as set forth in the PMA managing and

promoting a monetary return."  This is misleading. Each investor, as the property owner, had

the option to retain ABC Capital Realty as the property manager to manage and maintain the

property.   Each investor was the actual owner of the property.   As the owner, they had the

option of selling the property at any time.  And, each investor had the option of terminating the

agreement.  As discussed below, some of these investors managed their own property, some

sold their own properties, and some exercised the buy back option and their property was

purchased back. See Ex. "E", sample PMA.

51.     Plaintiffs state in their Legal Argument that "Plaintiffs well pleaded Complaint

identifies a clear Ponzi Scheme in which Defendants use proceeds from one investment (sale of

property) to fund distributions to other Investors disguised as rental income".  This is not true.

ABC issued rental payments to its investors when rent was received from tenants.  In the event

rent was not paid, ABC paid rent to its investors under the rental guarantee. This was our

expressed guarantee, and never disguised, as alleged.  Our only plan was to sell properties,

manage and renovate properties, and pay our investors, period.  There was no intent and no

practice of disguising rental income.

52.     Plaintiffs state that "Defendants had complete control over twenty-eight (28) Properties,

including but not limited to ability to, sell, transfer, collection of rent and management of some

properties up until 2019".  This is not true.  ABC required signed consents to sell Plaintiff's

properties. ABC did not sell any properties without the consent of the owner or their

representative.  In terms of management, beginning in 2018, the management of the rented

properties were assigned to Anchor Realty, and ABC was no longer managing these units.

53.     ABC communicated with Jubilee mostly, as the agent working in Hong Kong, to then

communicate with these investors. ABC did not withhold information from the investors, as

alleged by counsel in his legal argument. For example, ABC expressly updated the agent that

ABC's insurer was not processing its claims for rent guarantees. Here is the email:

From: **Jay Walsh** <jay@abccapitalinvestments.com>
Date: Mon, Dec 18, 2017 at 7:07 PM
Subject: ABC Loss of Rent Insurance Carrier and the effect on your clients
To: It's Jimmy <jimmyngai@jubilee-capital.com>
Cc: Mierra Isaac <misaac@abccapitalinvestments.com>

Jimmy,

As discussed, the rent insurance provider that ABC was using for 2017 went out of business
and did NOT honor our demands for payment.  We have filed a lawsuit against this company.
This may take years to resolve.  This was a major financial loss for ABC and ABC still
honored your clients out of ABC's pocket. That being said in 2018 ABC will not be able to
guarantee any rents.  We are not an insurance company and this is beyond our financial
capabilities.

Of course we know this impacts your clients and there are some alternatives. They are:

1. We have found a new rent insurance company.  In lieu of the financial loss we received this
year due to a rent insurance company not honoring our contract, we will NOT recommend any
insurance company and we will NOT be held liable if they do not pay the owners.  So we can

forward their information and how they work, but if they do not pay the clients ABC will not
be liable.  That will be a contract between the owner and the rent insurance company.  if your
owners choose to do this ABC WILL pay the fee for the rent insurance but will need the client
to sign a waiver acknowledging ABC is NOT liable for any rents not paid by tenants or the
rent insurance company.

2. ABC stands ready to buy the properties back from the clients prior to the 3 year
commitment.  In this case a least the client will have made their return and received their
principal back.

3. The client can keep the property and we will still manage it like we manage all NON fixed
income properties.  If the tenant pays they pay, if not they dont and the owner only gets paid
when the tenants pay.

Just a little more information about how the rent insurance companies pay.  They do NOT
reimburse the owners monthly.  They reimburse them once the tenant is out of the house.  This
is common.  So even with rent insurance your clients will have months they do not get paid
rent.



**Jay Walsh**
Co-founder & Partner, ABC Capital Investments, LLC
267-324-3926 ext 111 | jay@abccapitalinvestments.com |
investors: +1 215 253 8207 |

Philadelphia

1218 N Marshall St. Philadelphia, PA 19122|
www.abccapitalinvestments.com |



Baltimore

First Floor 3604 Eastern Ave. Baltimore, MD 21224|
www.abccapitalbaltimore.com |

54.     Plaintiffs state: "For several years, Plaintiffs did not receive any rental payments, have zero access to corporate books to assess the financial accounting, and are therefore severely limited in their ability to properly manage or maintain the Properties."  This is not accurate. ABC paid rents for all rents collected. ABC issued invoices for rent payments.  Plaintiff's agent, Jubilee, has been in contact with ABC, and we communicated in English with Jubilee's agents when requested. In this litigation ABC disclosed its rent ledgers for all properties in dispute to Plaintiffs.  Because the property management was transferred, Anchor has information for the prior 18 months approximately regarding current rent and rent payments. This was also identified in our discovery answers. And, ABC issued a subpoena to Anchor to compel the disclosure of this information.

55.     Plaintiffs state: "There is clear imminent harm to Plaintiffs by allowing Defendants to mismanage Plaintiffs income in the Accounts."  This is not accurate. ABC is not receiving any rental income for rent properties and no income has been received by ABC at all. There is no imminent or ongoing harm as ABC is <u>not</u> receiving or improperly retaining rent payments, as implied.

56.     Plaintiffs seek to enjoin are freeze bank accounts "used by Defendants previously to transmit rental payments collected on behalf of Plaintiffs".  ABC has not collected rent for approximately 18 months. There is no threat of imminent harm.

18

57.     Generally, no financial account of ABC should be enjoined.  The ABC companies continue to operate, have ongoing expenses, liabilities, and income.  Access to our accounts are necessary to meet our financial demands, and our business could not function if our accounts were frozen.

58.     Plaintiffs have cited past fines or unpaid utilities that are owed during ABC's management.  This does not refer to any current or future harm as this occurred in the past warranting an injunction. Moreover, ABC does not pay unpaid tenant gas, utility, or water bills. This is the obligation of the tenant. If the property is sold it would be paid from the seller's proceeds at the time. ABC's contract never required ABC to insure against unpaid utility bills.

59.     Plaintiffs state that Plaintiffs weren't "informed whether their properties were being sold". <u>This is not true at all</u>. The Plaintiff's representative who verified the Complaint did not reasonably investigate this matter by communicating with Plaintiffs. **ABC obtained signed consents to sell all properties from these investors**.  A signed consent or notarized deed would be required by the title company to sell a property in Pennsylvania. In discovery, Defendants have already produced all documents to disprove this.  The consents to sell are attached here collectively.  Ex. "F". Here is one consent signed by Plaintiff's IP Global:

<u>LLC Consent & Approval</u>

<u>We</u>, Ngai Wing Lui and Hoi Wah Leung being the members of IP Global

Investments, LLC, do hereby consent to and approve the sale of 1830 E

Airdrie Street, Philadelphia, PA 19124, in the amount of $68,000.00, minus

any customary closing cost.

Assigning Jason P. Walsh or Karen-Lee Walker to sign all documents,

including: Agreement of Sale, Addendums, Assignments, Affidavits, Deed

and Settlement Statements and further no other individuals or entities need

to sign on behalf of the above-named LLC.

Ngai Wing Lui                      Member
Dated: 30 JAN 2018

Hoi Wah Leung                      Member
Dated: 30 JAN 2018

60.     Plaintiffs state in their legal argument that, "Defendants can continue its racketeering

"scheme" given its exclusive access to Plaintiffs Accounts". This is very misleading. ABC

Capital is not collecting rent for Plaintiffs, and has not for over a year.  Moreover, <u>at any time</u>, a

Plaintiff can hire its own management company to oversee the property, or they can perform

this task directly. ABC never required any investor to remain with ABC. There is no continuing

harm, as alleged by counsel.

61.     Plaintiffs state in their legal argument that "there are over forty (40) litigated cases

against Defendants involving similar causes of action. If these litigated matters usurp Plaintiffs

monies in the Accounts and/or Properties, Plaintiffs harm will be immeasurable."  This is very

misleading and not substantiated.  First, this is to my knowledge the only complaint where it

has been alleged ABC Capital violated RICO and the Securities Act regulations. Second, ABC

does have other pending litigation, and other claims which have settled.  The Plaintiff has not

20

identified which cases are similar causes of action so we cannot address each one based on the general allegation. However, it will be stated that ABC Capital over nine years has been involved in over 7,500 real estate transactions in buying and selling, and that our litigation figures involve a small portion of all deals. In 2019, ABC Capital handled over 800 deals. ABC Capital has existing cash flow from its operations. ABC also has current financial obligations to support our business. Freezing of business bank accounts would prevent ABC from operating, and would be grossly unfair.

62.     Plaintiffs state in their legal argument that RICO authorizes "reasonable restrictions on the future activities" of violators.  ABC Capital strongly disagrees with the assertion that the ABC businesses violated RICO, as alleged, and as discussed earlier, there is no future violations threatened. ABC's inability to pay all rent guarantees was not a plan. It resulted from a number of market conditions that occurred after these deals were formed, and from ABC's rent insurer breaching its promises to ABC.

63.     Plaintiffs have cited to our website discussing our "886 clients and 1,357 properties", as evidence of the scope of our "enterprise". This is very misleading as well. It falsely implies that we have defrauded all or the majority of our investors. This is not true. In this specific lawsuit, every Plaintiff owned their own property which provided or continues to provide a source of equity for each Plaintiff. This is not a situation where ABC solicited cash and paid others with it. In discovery we have already produced all deeds and property closing documents for all properties. Likewise, some investors have already sold their properties through ABC or on their own to recoup their money, and in some cases where records are available, earned a profit due to an increase in property values in Philadelphia.  There is no credible public interest basis to

grant an injunction. Moreover, any freezing of assets would seriously undermine ABC's ability to operate and service our clients.

## III.    Legal Argument

The Court should find that Plaintiffs cannot obtain injunctive relief under their filed Complaint or based upon the allegations in their Motion.  Though not expressly referenced by Plaintiffs, a motion for preliminary injunction should be based upon Rule 65 of the Federal Rules of Civil Procedure and requires a high burden of proof.  The Third Circuit has set forth four factors which govern a district court's decision whether to issue a preliminary injunction:

(1) whether the movant has shown a reasonable probability of success on the merits;

(2) whether the movant will be irreparably injured by denial of the relief;

(3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and

(4) whether granting the preliminary relief will be in the public interest.

See SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1254 (3d Cir. 1985)).

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (emphasis deleted). As a threshold matter, "it is a movant's burden to show that the "preliminary injunction must be the only way of protecting the plaintiff from harm." Emile v. SCI-Pittsburgh, No. 04-974, 2006 U.S. Dist. LEXIS 73632, 2006 WL 2773261, *6 (W.D.Pa. Sept. 24, 2006) (quoting Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992)).

Accordingly, in order for Plaintiffs to sustain its burden of proof that it is entitled to a preliminary injunction under Fed.R.Civ.P. 65, Plaintiffs must demonstrate both a reasonable likelihood of success on the merits, and that they will be irreparably harmed if the requested relief is not granted. Abu-Jamal v. Price, 154 F.3d 128, 133 (3d Cir. 1998); Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir. 1982). If Plaintiffs fail to carry their burden on either of these elements, the motion should be denied since a party seeking such relief must "demonstrate both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989) (emphasis in original) (quoting Morton v. Beyer, 822 F.2d 364 (3d Cir. 1987)).

In the context of a commercial contract dispute, where monetary damages will result in the final outcome, a party seeking immediate injunctive relief must show more than just being owed a specific sum of money, they must also show an irreparable injury.   This is why Plaintiffs' motion must fail. "The availability of adequate monetary damages belies a claim of irreparable injury."  Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988).  "The applicant for a preliminary injunction bears the burden of establishing a right to such injunctive relief and that irreparable injury will result to him if it is not granted." Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc., 268 F.2d 569, 574 (3d Cir. 1959) (footnote omitted). Herein, not one Plaintiff has submitted a statement meeting this high burden.  Counsel for Plaintiff has argued that Defendants' accounts should be frozen to preserve money for a future judgment.  This however is not enough. See  In re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1145 (3rd Cir. 1982) ("we have never upheld an injunction where the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law")."

In 1987, the Third Circuit has observed:

> Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a "clear showing of immediate irreparable injury." <u>Continental Group, Inc. v. Amoco Chemicals Corp.</u>, 614 F.2d 351, 359 (3d Cir. 1980). The "requisite feared injury or harm must be irreparable-not merely serious or substantial," and it "must be of a peculiar nature, so that compensation in money cannot atone for it." <u>Glasco v. Hills</u>, 558 F.2d 179, 181 (3d Cir. 1977). "[W]e have never upheld an injunction where the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law." <u>In re Arthur Treacher's Franchisee Litigation</u>, 689 F.2d 1137, 1145 (3d Cir.1982). When the claim is based on a breach of contract, irreparable injury may be found in two situations: (1) where the subject matter of the contract is of such a special nature or peculiar value that damages would be inadequate; or (2) where because of some special and practical features of the contract, it is impossible to ascertain the legal measure of loss so that money damages are impracticable. <u>A.L.K. Corp. v. Columbia Pictures & Indus., Inc.</u>, 440 F.2d 761, 763 (3d Cir. 1971) (citing 4 J. Pomeroy, <u>Treatise on Equity Jurisprudence</u> § 1401 (5th ed. 1941)).

<u>ECRI v. McGraw-Hill, Inc.</u>, 809 F.2d 223, 226 (3d. Cir. 1987).

In our case, Plaintiffs have not alleged that monetary damages are an inadequate remedy. In fact, they have argued that monetary damages are the primary form of relief they are seeking. Plaintiffs have not submitted evidence in the form of affidavits or declarations, other than counsel's allegations, which show actual or imminent future irreparable harm to any or each Plaintiff. At best they have alleged past unpaid payments.   However, they are asking this Court for an extraordinary remedy-- freezing Defendants bank accounts to protect a future judgment since Defendants have, as they alleged, 40 other lawsuits filed against them. This is not warranted under the law in this civil lawsuit, and this outcome is supported by the Supreme Court, as discussed below. "[A]n essential prerequisite to the grant of a preliminary injunction is a showing by the movant of irreparable injury *pendente lite* if the relief is not granted." <u>United States v. Pennsylvania</u>, 533 F.2d 107, 110 (3d Cir. 1976).  In our case, there is no future harm and there is no irreparable injury.

24

Plaintiffs argue that they are concerned that Defendants face other lawsuits in support of freezing Defendant's bank accounts now, even before they secure a judgment. However, a preliminary injunction "may not be used simply to eliminate a possibility of a remote future injury." Holiday Inns of Am., Inc. v. B&B Corp., 409 F.2d 614, 618, 7 V.I. 45 (3d Cir. 1969). "[T]he irreparable harm must be actual and imminent, not merely speculative." Angstadt ex rel. Angstadt v. Midd-West Sch., 182 F. Supp. 2d 435, 437 (M.D. Pa. 2002). Further, "[a] preliminary injunction cannot be issued based on past harm. The purpose of a preliminary injunction is to prevent *future* irreparable harm." Fisher v. Goord, 981 F. Supp. 140, 168 (W.D.N.Y. 1997) (emphasis in original) (quoted by Blair v. Burrauno, No. 4:18-CV-01629, 2018 U.S. Dist. LEXIS 171139, at *9 (M.D. Pa. Oct. 1, 2018)).

Here, Plaintiff's argument that Defendants face 40 other lawsuits is unsupported with an affidavit or other evidence regarding the merits of each case, or the scope of potential liability, if any. Counsel's concern with future insolvency is not sufficient to freeze assets or for a district court to grant a preliminary injunction, even if a party defendant concedes financial damages are owed to Plaintiffs.  However, this is not enough to make Plaintiffs, who are all unsecured creditors, judgment holders at this point in the litigation. In light of Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 119 S. Ct. 1961, 144 L. Ed. 2d 319 (1999), the Supreme Court of the United States has recognized that concern for party's solvency is not a basis for injunctive relief and that a district court cannot freeze assets pending adjudication of the plaintiff's contract claims for damages until there is an actual judgment.

The Court explained:

> The requirement that the creditor obtain a prior judgment is a fundamental
> protection in debtor-creditor law -- rendered all the more important in our federal
> system by the debtor's right to a jury trial on the legal claim. There are other
> factors which likewise give us pause: The remedy sought here could

render Federal Rule of Civil Procedure 64, which authorizes use of state prejudgment remedies, a virtual irrelevance. Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available? More importantly, by adding, through judicial fiat, a new and powerful weapon to the creditor's arsenal, the new rule could radically alter the balance between debtor's and creditor's rights which has been developed over centuries through many laws -- including those relating to bankruptcy, fraudulent conveyances, and preferences. Because any rational creditor would want to protect his investment, such a remedy might induce creditors to engage in a "race to the courthouse" in cases involving insolvent or near-insolvent debtors, which might prove financially fatal to the struggling debtor. (In this case, we might observe, the respondents did not represent all of the holders of the Notes; they were an active few who sought to benefit at the expense of the other noteholders as well as GMD's other creditors. )

Grupo Mexicano De Desarrollo v. All. Bond Fund, 527 U.S. 308, 330-32, 119 S. Ct. 1961, 1973-74 (1999).

The Court also explained the concept in these terms:  "it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestering his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence." Grupo Mexicano, 527 U.S. at 327 (quoting De Beers Consol. Mines v. United States, 325 U.S. 212, 222-23, 65 S. Ct. 1130, 89 L. Ed. 1566 (1945)); see also, Black Mtn. Equities v. Pacific Gold Corp., 2012 U.S. Dist. LEXIS 169295, at *34 (D.N.J. Nov. 27, 2012) (injunctive relief denied where plaintiff seeks to secure a money judgment to which it may someday be entitled).

In our case, Plaintiffs seek primarily an asset freeze to protect its ability to collect any future judgment. This legal remedy is not permitted under Grupo Mexicano. Courts have denied preliminary injunctions demanded to preserve assets to pay a future judgment.  J&S Development Corp. v. Montrose Global Assets, Inc. 279 F. App'x 131

26

(3d Cir. 2008).  In our case all damages alleged are capable of being calculated, and there is no irreparable harm.

Furthermore, any equitable claim where Defendants must turn over the books is unwarranted where Defendants have already produced its records related to each property in its Rule 26 disclosure, and will continue to supplement its production of records upon receipt of records from third parties. Grupo Mexicano held that a court is not authorized to freeze a defendant's assets solely to preserve a plaintiff's right to recover damages and this should be followed here.

The above arguments focused on the second element necessary to establish an injunction since it is evident this burden cannot be established.  The first element requires Plaintiffs to show that they have a meritorious case.  This element has not been fully addressed because Defendants admittedly recognize money is owed under the contracts by the Defendants who entered into the contracts, and that renovation work remains to be performed on certain properties for some Plaintiffs.  Defendants do strenuously dispute the amount of money owed, and dispute that all Defendants are liable, including the individuals named. For example, Plaintiffs claim $200,000 or less was paid out in rental payments, and in response to this motion, Defendants have attached financial summaries showing over $400,000 have been paid. This casts serious doubts on the nature of their allegations. Also, while Plaintiffs have been joined together, each case is distinct with separate defenses and different amounts owed, if any.

Plaintiffs nevertheless have taken a breach of contract claim for non-payment and transformed it into a federal RICO and Securities Act claims seeking treble damages and counsel fees, and now injunctive relief.  This is not proper.  The Answer filed by Defendants identifies all

27

of the viable defenses.  Ex. "G", Answer.  Because it is recognized that some amount money is

owed, we will not address the merits of each claim or the merits of each for each Plaintiff under

all causes of action.[4]

Also, it will be briefly noted that the Racketeer Influenced and Corrupt Organizations

Act ("RICO") 18 U.S.C.A. §§ 1961- 1968 should ultimately not apply in this matter, and

Defendants will move to dismiss this cause of action. Civil RICO claims based on mail and wire

fraud require proof that the defendants have acted in a deceitful manner. Though the scheme to

defraud "need not be fraudulent on its face, [it] must involve some sort of fraudulent

misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence

and comprehension." United States v. Pearlstein, 576 F.2d 531, 535 (3d Cir. 1978)(internal

quotations omitted); see also, e.g., Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d

Cir. 1991).  "Courts have repeatedly found the element of deceit missing in breach of contract

claims." Sunlight Elec. Contracting Co. v. Turchi, 918 F. Supp. 2d 392, 404-06 (E.D. Pa. 2013)

(citing Kolar v. Preferred Real Estate Invs.'s, Inc., 361 F. App'x 354, 362 (3d Cir. 2010), and

dismissing RICO claims where plaintiff claimed that defendants diverted money they owed him

to other defendant-controlled entities).  In Annulli v. Panikkar, 200 F.3d 189, 199-200 (3d Cir.

1999), the Court explained that "theft by deception, like a simple breach of contract or

intentional interference with contract, is not a predicate act of racketeering activity enumerated

---

[4] As noted in Defendant's Answer, Plaintiffs are not purchasers or sellers of securities and no private civil cause of action for securities fraud is available.   The alleged Investment Advisors Act does not apply as Defendants were not investment advisors.  In the context of a preliminary injunction, Defendants do not concede that these laws apply, but at this time, will not address each area of the law alleged to apply since Plaintiffs cannot establish irreparable harm regardless of the cause of action.

in § 1961(1) . . . We will not read language into § 1961 to federalize every state tort, contract, and criminal law action." The <u>Annulli</u> court explained its reasoning:

> First, RICO's list of acts constituting predicate acts of racketeering activity is exhaustive. To read it otherwise would be to usurp the role of Congress in drafting statutes. Second, if garden-variety state law crimes, torts, and contract breaches were to constitute predicate acts of racketeering (along with mail and wire fraud), civil RICO law, which is already a behemoth, would swallow state civil and criminal law whole. Virtually every litigant would have the incentive to file their breach of contract and tort claims under the federal civil RICO Act, as treble damages and attorney's fees would be in sight. We will not read language into § 1961 to federalize every state tort, contract, and criminal law action.

<u>Id.</u>, at 200 (internal citations omitted). <u>See</u> <u>also</u> <u>Fuce v. West</u>, No. 12-0874, 2012 U.S. Dist. LEXIS 104209, 2012 WL 3046235, at *3 (E.D. Pa. July 26, 2012) (finding that "[d]espite [plaintiff]'s efforts to transform [defendant]'s conduct into criminal offenses, it is clear that he alleges a breach of contract cause of action", where plaintiff alleged that defendant had paid him less than he had agreed to in an employment contract).

In our case, Mr. Walsh on behalf of ABC has verified through his declaration that the ABC Defendants did not plan or scheme to defraud its clients. All clients owned a property. ABC has attached records showing over $450,000 of rent payments, and they have repurchased multiple properties with the written consent and permission of the Plaintiff property owners, despite what was alleged by Plaintiffs. Moreover, each Plaintiff owns a property, and can manage it, or sell it, to ABC Capital, or on the open market.  It is recognized that over time construction delays occurred, and in an unexpected manner, ABC's rent insurer did not issue or pay claims ABC expected to rely upon to meet their obligations.  This factual explanation of what occurred does not meet the rigorous standards of a RICO or fraud claim, as alleged. Instead, at best, certain Plaintiffs have claims for monetary damages as a result of contractual breaches only.

Defendants will conclude by addressing the final two factors to be considered in granting injunctive relief. Herein, a greater injury would result to ABC if the injunction was granted. ABC continues to operate and requires regular daily access to its accounts to pay employees and contractors.  ABC requires access to its accounts to pay for construction materials and labor for some of the properties that still require renovation. More importantly, ABC has other properties that require renovation work and access to ABC's accounts are critical and necessary to keep the business financially afloat. ABC, as with any other real estate businesses, also has liabilities, and requires access to its accounts to pay its bills.  Because all of Plaintiff's damages are economic, there is no irreparable harm, and freezing business accounts should be seen as an extraordinary sanction which is unwarranted here.

Finally, granting the preliminary relief will not be in the public interest since our dispute involves private litigants who are owed a disputed amount of money. There is no ongoing harm occurring to members of the public that this injunction will serve. See generally, Cont'l Grp., Inc. v. Amoco Chems. Corp., 614 F.2d 351, 358 (3d Cir. 1980) ("The public interest was in specific action rather than in the vindication of an abstract principle, and was considered within the confines of disputes involving governmental agencies or programs rather than in the adjudication of private controversies").  Herein, the property management agreements were with a distinct group of private real estate investors. An injunction which freezes bank accounts has been demanded merely to benefit the expected judgment of these Plaintiffs.  As discussed above this is not sufficient to warrant injunctive relief. Moreover, as set forth above, the freezing of accounts will significantly interfere with Defendants' business operations, and those businesses and persons who conduct business with the ABC companies and who rely upon payments from ABC.

For all of these reasons this Injunction must be denied.

WHEREFORE, Defendants, respectfully requests this Honorable Court to enter the Order attached hereto denying Injunctive Relief.

**THE SWAIN LAW FIRM, P.C.**

By: *s/Andrew D. Swain*
    ANDREW D. SWAIN, ESQUIRE

## DECLARATION OF JASON WALSH

1.  I, Jason Walsh, state that I am the co-owner of the named Defendant business entities ("ABC Capital") and I am individually named in this lawsuit.
2.  I have reviewed the Plaintiff's Complaint and Plaintiff's Motion for Injunctive Relief.
3.  I have first-hand and personal knowledge of the facts set forth in Defendants' Opposition to Plaintiff's Motion for Injunctive Relief, and I have also reviewed ABC Capital's business and financial records to verify the statements included in our opposition.
4.  My counsel prepared the Factual Background section which I reviewed and approved.
5.  I can represent that the statements set forth under the Factual Background section of ABC's response are true and correct.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 3, 2020.

*Jason P Walsh*
Jason P Walsh (Jul 3, 2020 14:37 EDT)

Jason Walsh, on behalf of
ABC Capital Investments, LLC,
ABC Capital Realty, LLC,
Philly Acquisitions, LLC,
Giovanni Real Estate, LLC,
New Philly Construction, LLC, and
Stateside-Philly, LLC

Ex. "A"